# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BANDERA MASTER FUND LP, BANDERA VALUE FUND LLC, BANDERA OFFSHORE VALUE FUND LTD., LEE-WAY FINANCIAL SERVICES, INC., and JAMES R. MCBRIDE, on behalf of themselves and similarly situated BOARDWALK PIPELINE PARTNERS, LP UNITHOLDERS, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0372-JTL |
| BOARDWALK PIPELINE PARTNERS, LP, BOARDWALK PIPELINES HOLDING CORP., BOARDWALK GP, LP, BOARDWALK GP, LLC, and LOEWS CORP., | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 2, 2019
Date Decided: October 7, 2019

A. Thompson Bayliss, J. Peter Shindel, Jr., ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Plaintiffs*.

Srinivas M. Raju, Blake Rohrbacher, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Rolin P. Bissell, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Lawrence Portnoy, Charles S. Duggan, Gina Cora, DAVIS POLK & WARDWELL LLP, New York, New York; Stephen P. Lamb, Andrew G. Gordon, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Defendants*.

**LASTER, V.C.**

In April 2018, Boardwalk Pipeline Partners, LP (the "Partnership" or "Boardwalk") announced that its general partner was seriously considering whether to exercise an option to purchase all the Partnership's publicly traded common units (the "Call Right"). The announcement caused the trading price of the common units to plummet. In July, the general partner exercised the Call Right and purchased the common units at what the plaintiffs contend was an artificially depressed price.

The plaintiffs are former holders of common units who seek to hold the defendants accountable for the allegedly wrongful exercise of the Call Right. The plaintiffs contend that the defendants should be held primarily liable for breaching their fiduciary duties, their express contractual obligations, and their implied contractual obligations. The plaintiffs contend that the defendants who are not primarily liable should be secondarily liable for aiding and abetting the other defendants' breaches of fiduciary duty and for tortious interference with contract.

The defendants moved to dismiss the complaint under Rule 12(b)(6) for failing to state a claim on which relief can be granted. This decision grants the motion as to the claims premised on breaches of fiduciary duty. It also grants the motion as to certain claims that sound in contract. It denies the motion as to other contract-based claims.

## I. FACTUAL BACKGROUND

The facts are drawn from the currently operative complaint, the documents integral to it, and the documents that it incorporates by reference. At this procedural stage, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all

reasonable inferences. Citations in the form "Ex. — at —" refer to exhibits to the complaint.

## A. The Partnership

The Partnership is a Delaware limited partnership engaged in the business of storing and transporting natural gas products. The Partnership's general partner is defendant Boardwalk GP, LP (the "General Partner"), which owns a 2% general partner interest in the Partnership. The General Partner is itself a Delaware limited partnership, and the general partner of the General Partner is defendant Boardwalk GP, LLC ("GPGP"). Defendant Loews Corporation ("Loews") owns and controls GPGP through defendant Boardwalk Pipelines Holding Corp. ("Holdings"), which is the sole member of GPGP. Loews thus controls both the General Partner and the Partnership.

Before the events giving rise to this litigation, the Partnership's common units traded on the New York Stock Exchange under the symbol BWP. Through Holdings, Loews owned common units representing a 51.2% limited partner interest in the Partnership.

The Partnership's internal affairs were governed by its Third Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement" or "Agr."). Section 15.1 of the Partnership Agreement set out the Call Right, which gave the General Partner the option under specified circumstances to acquire all of the common units that the General Partner or its affiliates did not already own.

Two conditions had to be met before the General Partner could exercise the Call Right. First, the General Partner and its affiliates had to own more than 50% of the

2

Partnership's limited partner interests. Second, the General Partner had to receive an "Opinion of Counsel" that its pass-through tax status "has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers." Agr. § 15.1(b). The Partnership Agreement defined the term "Opinion of Counsel" as "a written opinion of counsel . . . acceptable to the General Partner." *Id.* § 1.1 at 17.

Section 15.1(c) of the Partnership Agreement required the Partnership to mail a notice to the record holders of common units informing them about the exercise of the Call Right. The pricing formula for the Call Right used a date three days before the mailing of the notice as the end date for a measurement period. Under the formula, the purchase price per common unit would be the average of the daily closing prices for the common units during the 180 consecutive trading days immediately before the end date. Through this mechanism, the purchase price would be set before the holders of common units received notice that the General Partner had exercised the Call Right, resulting in a purchase price that was not affected by the exercise of the Call Right.

**B.     FERC Changes Its Rate-Setting Policies.**

The Partnership earns money by charging customers for natural gas transportation and storage services. In pipeline parlance, the customers are sometimes called shippers, and the rates that the pipeline charges its shippers are sometimes called tariffs.

The Federal Energy Regulatory Commission ("FERC") establishes a schedule of approved rates for each interstate pipeline. The approved rates are not mandatory rates. The pipeline and its shippers can contract for services at negotiated rates, which can be higher

or lower than the FERC-approved rates. When negotiating the terms of the contract, however, the shipper can always reject the pipeline's terms and choose to ship at the FERC-approved rates. Because the shipper has recourse to the FERC-approved rates, the latter are called "recourse rates." The pipeline can also choose to charge shippers discounted rates, which must be less than the recourse rates.

When setting recourse rates, FERC calculates an amount sufficient to enable the pipeline to recover all of its costs of service plus earn a profit that will compensate its investors. One component of a pipeline's cost of service is the income taxes that it pays. The level of profit reflects the pipeline's cost of capital based on the components of its capital structure.

Historically, FERC allowed pipeline owners to recover an income tax allowance based on the assumption that the pipeline would pay federal corporate income taxes at the longstanding headline rate of 35%. FERC even allowed pipelines organized as master limited partnerships ("MLP pipelines") to recover this income tax allowance, despite the fact that MLP pipelines are pass-through entities for tax purposes and thus do not pay tax at the entity level.

On March 15, 2018, FERC announced a major change in its treatment of MLP pipelines for purposes of setting tariff rates. Ex. 4 (the "Revised Policy Statement"). Under the new policy, MLP pipelines would no longer be permitted to recover an income tax allowance when calculating their costs of service. The Revised Policy Statement became effective when it was published in the *Federal Register* on March 21, 2018.

4

At the same time it announced the Revised Policy Statement, FERC issued a notice of inquiry that solicited comment on the implications of the Revised Policy Statement for a separate aspect of pipeline tax treatment. *See* Inquiry Regarding the Effect of the Tax Cuts and Jobs Act on Commission-Jurisdictional Rates, 83 Fed. Reg. 12,371 (Mar. 21, 2018) (the "Notice of Inquiry"). Various tax regulations permit pipelines to depreciate their assets on an accelerated basis. When calculating tariff rates, however, FERC uses straight-line depreciation. Because a pipeline can claim depreciation more quickly than FERC's method anticipates, the pipeline pays lower taxes in the early years, resulting in greater cash flows than FERC's projections contemplate. The value of the increased cash flows builds up as an asset on the pipeline's balance sheet called "Accumulated Deferred Income Tax" or "ADIT." Once the accelerated depreciation ends, the pipeline pays higher taxes than FERC's projections contemplate, and the increased tax payments reduce the ADIT balance.

By accelerating depreciation and deferring taxes, the pipeline benefits from the time-value of money. FERC therefore historically treated the value of the pipeline's ADIT balance as cost-free capital when determining the rate of return that a pipeline needed to earn from its tariff rates. All else equal, a pipeline with an ADIT balance would have lower recourse rates than a pipeline without an ADIT balance, because the pipeline with an ADIT balance would not need to earn a return on that portion of its capital structure. The same principle would hold for a relatively higher ADIT balance versus a lower ADIT balance.

In the Notice of Inquiry, FERC asked for comments regarding the implications of the Revised Policy Statement for the rules governing ADIT balances. One possible

5

implication would be the elimination of ADIT balances for MLP pipelines. Eliminating their ADIT balances would benefit those entities by removing a block of cost-free capital from their asset bases, thereby increasing the value of the assets on which MLP pipelines needed to earn a return. Viewed in isolation, the elimination of ADIT balances would enable MLP pipelines to ask FERC to approve higher recourse rates. The implications of removing the ADIT balances were not entirely clear, however, because it could be argued that any benefits from removing the ADIT balances should be shared with shippers, creating near-term liabilities for the MLP pipelines that could offset the benefits.

The Notice of Inquiry also addressed the implications of the Tax Cuts and Jobs Act of 2017 (the "Tax Act"), which reduced the headline corporate income tax rate from 35% to 21%. Viewed in isolation, a reduction in the tax rate would reduce the value of accelerated depreciation and hence the value of the ADIT balances. The implementation of the Tax Act thus had the same potential implications as the elimination of ADIT balances, albeit to a lesser degree because the ADIT balances would be reduced rather than eliminated. The Tax Act also affected all pipelines, not just MLP pipelines.

In addition to the Revised Policy Statement and Notice of Inquiry, FERC issued a notice of proposed rulemaking that set out a process for addressing the implications of the Revised Policy Statement and the Tax Act for pipeline recourse rates (the "Notice of Rulemaking"). The proposed rulemaking contemplated that each pipeline would submit a new form to FERC in which the pipeline owner would report information and select one of four options for its rates.

**C.      The Partnership Responds To The Revised Policy Statement.**

The day after FERC issued the Revised Policy Statement, the Notice of Inquiry, and the Notice of Rulemaking, the Partnership addressed the implications of the regulatory changes. In a press release dated March 16, 2018, the Partnership stated: "Based on a preliminary assessment, Boardwalk does not expect FERC's proposed policy revisions to have a material impact on the company's revenues." Ex. 9. The press release explained that for two of the Partnership's four operating subsidiaries, "[a]ll of the firm contracts are negotiated or discounted rate agreements, which are not ordinarily affected by FERC's policy revisions." *Id.* For its other two operating subsidiaries, a rate moratorium remained in place until 2023, so the Revised Policy Statement would not affect the rates those subsidiaries could charge.

Approximately one month later, on April 25, 2018, the Partnership responded to the Notice of Inquiry by submitting comments to FERC. The Partnership essentially asked FERC to reverse the Revised Policy Statement and provide instead "that all pipelines, including, [sic] MLP pipelines, are permitted to propose a tax allowance in future rate proceedings . . . ." Ex. 10 at 5. The Partnership also asked FERC to clarify how it planned to treat ADIT balances and confirm that the revised policy would not affect negotiated rate agreements.

**D.      The Partnership Announces The Potential Exercise Of The Call Right.**

On April 30, 2018, the Partnership filed its Form 10-Q. In a section discussing FERC's recent regulatory actions, the Partnership stated:

7

> While we are continuing to review FERC's Revised Policy Statement, [Notice of Inquiry,] and [Notice of Rulemaking], based on a preliminary assessment, we do not expect them to have a material impact on our revenues in the near term. All of the firm contracts on Gulf Crossing and the majority of contracts on Texas Gas Transmission, LLC are negotiated or discounted rate agreements, which are not ordinarily affected by FERC's policy revisions. Gulf South currently has a rate moratorium in place with its customers until 2023, which we believe will be unaffected by these actions.

Ex. 11 at 28. The Partnership thus generally maintained the position taken in its initial press release, while clarifying that FERC's regulatory actions were unlikely to have a material impact on revenues *in the near term*. The Partnership's initial press release had not limited the absence of a material impact to the near term.

Despite this relatively anodyne disclosure, the Partnership's Form 10-Q went on to disclose that in light of FERC's actions, the Partnership was evaluating whether to remain a publicly traded entity, citing the potential exercise of the Call Right by the General Partner (the "Potential-Exercise Disclosure"). *See id.* at 28–29, 34. The Form 10-Q stated flatly: "***[O]ur general partner has a call right that may become exercisable because of recent FERC action. Any such transaction or exercise may require you to dispose of your common units at an undesirable time or price, and may be taxable to you.***" *Id.* at 34 (emphasis in original). Continuing, the Form 10-Q explained:

> [A]s has been described in our SEC filings since our initial public offering, our general partner has the right under our partnership agreement to call and purchase all of our common units if (i) it and its affiliates own more than 50% in the aggregate of our outstanding common units and (ii) it receives an opinion of legal counsel to the effect that our being a pass-through entity for tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers by our subsidiaries that are regulated interstate natural gas pipelines. Because our general partner and its affiliates hold more than 50%

8

of our outstanding common units, this call right would become exercisable if our general partner receives the specified opinion of legal counsel.

The magnitude of the effect of the FERC's Revised Policy Statement may result in our general partner being able to exercise this call right. Any exercise by our general partner of its call right is permitted to be made in our general partner's individual, rather than representative, capacity; meaning that under the terms of our partnership agreement our general partner is entitled to exercise such right free of any fiduciary duty or obligation to any limited partner and it is not required to act in good faith or pursuant to any other standard imposed by our partnership agreement. Any decision by our general partner to exercise such call right will be made by [Holdings], the sole member of [GPGP], rather than by our Board. . . . *We have been informed by [Holdings] that it is analyzing the FERC's recent actions and seriously considering its purchase right under our partnership agreement in connection therewith.*

*Id.* at 34 (emphasis added).

On the same day, the Partnership held an earnings call. During the call, the Partnership reiterated its clarification that the policy was unlikely to have a material impact on revenues *in the near term. See* Ex. 12 at 5. The Partnership also reiterated that Loews was "seriously considering" whether to cause the General Partner to exercise the Call Right. *Id.* The Partnership declined to take questions concerning "the decision making process or the possible timing of any such decision," instead referring investors to its public filings. *Id.*; *see id.* at 8.

Later that day, Loews made a similar announcement during its earnings call. Loews stated that it was "exploring all [its] options" and that "no decisions ha[d] yet been made." Ex. 13 at 3. Loews likewise declined to answer questions about the Call Right, instead referring investors to its public filings. *See id.* at 3, 6, 7.

9

During the week after the Potential-Exercise Disclosure, the market price of the Partnership's common units fell from $11.04 to $9.26, reflecting a decline of 16%. Numerous investors and research analysts objected to Lowes and the General Partner relying on FERC's regulatory actions as a basis for exercising the Call Right. They also objected that the Potential-Exercise Disclosure enabled the Partnership and Loews to undermine the contractually specified mechanism for determining the call price.

## E.     The Original Plaintiffs File Suit And Reach A Settlement.

On May 24, 2018, two holders of common units (the "Original Plaintiffs") filed this action and moved for expedited proceedings. The Original Plaintiffs wanted to prevent the General Partner from exercising the Call Right using a 180-day measurement window that included trading days that had been affected by the Potential-Exercise Disclosure. The defendants opposed the motion, arguing that the dispute was not ripe because the General Partner had not yet elected to exercise the Call Right. The court agreed with the defendants and denied the motion to expedite.

After defeating the motion to expedite on the theory that the claims were not yet ripe, defense counsel contacted the lawyers for the Original Plaintiffs to explore settling the not-yet-ripe claims. Ex. 35 at 14–17. On May 30, 2018, the Original Plaintiffs offered to settle if the defendants agreed to exercise the Call Right using June 1, 2018, as the end date for the 180-day measurement period, which would have included twenty-four affected trading days in the calculation. The defendants countered with an end date of September 1, 2018, which would have included sixty-four affected days in the calculation. After further back and forth, the parties agreed to an end date of June 29, 2018, which included forty-

10

four affected days in the calculation. Using that end date, the pricing formula yielded a purchase price for the Call Right of $12.06 per unit.

The parties spent two weeks drafting settlement documents. On June 22, 2018, they informed the court by email that they had reached an agreement in principle and asked the court to review the settlement papers *in camera*. The court rejected that request as seeking a non-public advisory opinion.

Later that night, the parties signed and filed their proposed settlement, which contemplated the certification of a class and provided the defendants with a broad release of all claims. After the settlement was announced, several unitholders objected to its terms. *See* Exs. 41 & 42.

**F.      The Call-Right Exercise**

On June 29, 2018, the Partnership announced that the General Partner would exercise the Call Right on July 18 at a price of $12.06 per unit (the "Call-Right Exercise"). The Partnership reported that Baker Botts LLP had provided the General Partner with the opinion of counsel required by the Partnership Agreement (the "Tax Opinion").

A few hours later, FERC announced a final rule that addressed several open issues about its rate-setting policies for MLP pipelines, including two of the issues that the Partnership had raised in its comments. Ex. 2 (the "Final Rule"). First, FERC announced that because the Revised Policy had eliminated the income tax allowance for MLP pipelines, those entities could eliminate their accumulated ADIT balances. Going forward, a pipeline owner like the Partnership would not need to need subtract an ADIT balance from the pipeline's asset base when seeking approval for a tariff rate and thus could seek a

11

competitive rate of return on its entire rate base. The practical effect of the Final Rule was to enable MLP pipelines to ask FERC to approve higher rates. Equally important, FERC determined that when an MLP pipeline eliminated its ADIT balance, it would not be required to return any amounts to shippers. Ex. 2 at 85–90. As a result of these clarifications, instead of the Revised Policy Statement having an adverse impact on the rates that MLP pipelines could charge, the Revised Policy Statement had a potentially favorable impact.

On the second issue, FERC confirmed that the Revised Policy Statement would not affect negotiated rate contracts. *Id.* at 157–60. The Revised Policy Statement would thus not affect the Partnership's negotiated rates, consistent with the announcement the Partnership initially made in response to the Revised Policy Statement.

On July 18, 2018, the General Partner exercised the Call Right. As a result, the Partnership became a wholly owned subsidiary of the General Partner and its affiliates.

**G.      The Settlement Is Rejected, And The Current Plaintiffs Pursue The Litigation.**

The current plaintiffs objected to the proposed settlement. On September 28, 2018, the court declined to approve it. Because the current plaintiffs had prevailed on their objections, the court permitted them to take over the litigation.

The current plaintiffs subsequently filed the operative complaint. They allege that the defendants carried out a "deliberate scheme" to "manipulate[] Boardwalk's common unit price for their own benefit" that included making the Potential-Exercise Disclosure so

12

that the price of the common units would plummet. Compl. ¶¶ 1, 171. Based on the

allegations in the complaint, the current plaintiffs assert six causes of action:

- Count I seeks a declaratory judgment that the defendants breached the express terms of the Partnership Agreement, the implied covenant of good faith and fair dealing, and their fiduciary duties.

- Count II contends that the Partnership, the General Partner, and GPGP breached the Partnership Agreement by exercising the Call Right in bad faith and in breach of the express terms of the Partnership Agreement.

- Count III contends that the Partnership, the General Partner, and GPGP breached the implied covenant of good faith and fair dealing that inheres in the Partnership Agreement by "teasing" the market that they were "seriously considering" exercising the Call Right, thereby depressing the unit price and allowing the General Partner to exercise the Call Right at a price significantly lower than intended by the Partnership Agreement. Compl. ¶ 226.

- Count IV contends that Holdings, the General Partner, GPGP, and Loews breached their equitable and contractual fiduciary duties to the Partnership and its limited partners by engaging in a "scheme [that] culminat[ed] in the improper and unauthorized exercise of the Call Right to purchase the common units of all minority unitholders after Defendants had deliberately depressed the Purchase Price by threatening to exercise the Call Right . . . ." Compl. ¶¶ 240, 242.

- Count V contends that GPGP, Holdings, and Loews aided and abetted the General Partner's breach of its equitable and contractual fiduciary duties to the Partnership and its limited partners by causing the General Partner to breach its duties.

- Count VI alleges that GPGP, Holdings, and Loews tortiously interfered with contractual relations by using their control over the General Partner to cause it to breach the Partnership Agreement.

## II.    LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Rule 12(b)(6) for failure

to state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion,

this court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits

vague allegations if they give the opposing party notice of the claim, and (iii) draws all

reasonable inferences in favor of the plaintiffs. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

This decision does not address the counts of the complaint in the order presented. It does not discuss Count I at all, because that count seeks redundant declaratory judgments on the same issues raised substantively by the other counts. This decision's rulings on the other counts suffice to address the parallel declaratory judgments sought in Count I. This decision starts with Count IV, which asserts a claim for breach of fiduciary duty, then addresses a related claim in Count V for aiding and abetting a breach of fiduciary duty. These claims are readily swept away because the Partnership Agreement eliminated all fiduciary duties. This decision then returns the core contract-based claims that logically demarcate the disputed terrain in a purely contractual entity. At the pleading stage, the complaint states claims for breach of the express provisions of the Partnership Agreement (Count II), breach of the implied covenant that inheres in the Partnership Agreement (Count III), and tortious interference with the Partnership Agreement (Count VI).

## A.      Count IV: Breach Of Fiduciary Duty

Count IV of the complaint contends that the General Partner and its controllers breached their fiduciary duties when engaging in the conduct challenged in the complaint. The language of the Partnership Agreement clearly eliminated fiduciary duties. As a result, Count IV fails to state a viable claim.

14

The Delaware Limited Partnership Act gives "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." 6 *Del. C.* § 17-1101(c). This freedom is "often exercised in the MLP context" by "eliminating any fiduciary duties a partner owes to others in the partnership structure." *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017) (citing 6 *Del. C.* § 17-1101(d)). By doing so, the drafters of a limited partnership agreement replace fiduciary duties with contractual obligations. *Id.* If fiduciary duties have been validly eliminated, "the limited partners cannot rely on traditional fiduciary principles to regulate the general partner's conduct." *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 252 (Del. 2017).

The drafters of the Partnership Agreement chose to eliminate all common law duties, including fiduciary duties, that the General Partner and its affiliates might otherwise have owed to the Partnership and its limited partners. Section 7.9(e) of the Partnership Agreement states:

> Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner or Assignee and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee.

Agr. § 7.9(e). The Partnership Agreement defines the term "Indemnitee" to include the General Partner and "any Person who is or was an Affiliate of the General Partner . . . ." *Id.* § 1.1 at 12. The Partnership Agreement defines the term "Affiliate" as "with respect to any Person, any other Person that directly or indirectly through one or more intermediaries

15

controls, is controlled by or is under common control with, the Person in question." *Id.* § 1.1 at 3. Consequently, GPGP, Holdings, and Loews are Indemnitees for purposes of the Partnership Agreement.

The language of Section 7.9(e) eliminated all "duties or liabilities, including fiduciary duties" owed by the General Partner and its affiliates to the Partnership and its limited partners. Section 7.9(e) left in place only those duties and liabilities "expressly set forth in [the Partnership] Agreement." Thus, the only duties and liabilities that the General Partner, GPGP, Holdings, and Loews owed to the Partnership and its limited partners were contractual obligations found in the Partnership Agreement.

Because the Partnership Agreement eliminated fiduciary duties and replaced those duties with contractual obligations, the plaintiffs have not stated a claim for breach of fiduciary duty. *See Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1100–01 (Del. Ch. 2014) (interpreting identical provision). Count IV is therefore dismissed.

## B.      Count V: Aiding And Abetting A Breach Of Fiduciary Duty

Count V of the complaint contends that GPGP, Holdings, and Loews aided and abetted the General Partner's breach of its fiduciary duties. One of the elements of a claim for aiding and abetting a breach of a fiduciary duty is "the existence of a fiduciary relationship." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) (internal quotation marks omitted). Once Section 7.9(e) of the Partnership Agreement eliminated the General Partner's fiduciary duties, there was no fiduciary relationship that could support a claim for aiding and abetting a breach of fiduciary duty. Count V is therefore dismissed.

16

## C. Count II: Breach Of The Express Terms Of The Partnership Agreement

Count II of the complaint contends that the General Partner, GPGP, and the Partnership breached their express obligations under the Partnership Agreement. First, the plaintiffs claim that the General Partner failed to adhere to the standards of conduct set forth in Section 7.9 of the Partnership Agreement.[1] Second, the plaintiffs claim that the

---

[1] The complaint refers to the standards of conduct in Section 7.9 as "contractual fiduciary duties." As discussed *supra*, Section 7.9(e) eliminated all fiduciary duties and, in place of those equitable duties, substituted contractual commitments, including the standards of conduct that appear in Section 7.9. Accordingly, this opinion analyzes any claims that the plaintiffs brought for breach of "contractual fiduciary duties" as claims for breach of contract.

This choice of language reflects the location of the Partnership Agreement at the extreme contractual end of the spectrum of relationships that can implicate fiduciary duties. At the other end of the spectrum is a fiduciary relationship where the parties have not reached any agreements regarding the scope of the fiduciary's duties or the standards that will govern the fiduciary's behavior. In that setting, the doctrines of equity control.

Between those ends lies a range of possible blends of contract and equity. A contract might clearly create the fiduciary relationship and specify in what respects the counterparty acts as a fiduciary. For instance, an engagement letter or other agreement might appoint an agent for a particular purpose. A fiduciary duty of that type, which would not exist but for the contract, is perhaps most fittingly described as a contractual fiduciary duty. A more common scenario involves a fiduciary relationship that arises by virtue of a party's status but is regulated or modified by contract. For practitioners of Delaware entity law, a familiar example involves the director of a Delaware corporation. That fiduciary relationship arises once the individual assumes the role of director, but the scope, dimensions, and details of the relationship can be regulated through the corporate contract, which consists of the Delaware General Corporation Law, charter, and bylaws. Most plainly, the charter may provide that the director is not liable for damages for breach of the duty of care, although the duty itself continues to operate. *Compare* 8 *Del. C.* § 102(b)(7) (authorizing limitation of damages), *with Malpiede v. Townson*, 780 A.2d 1075, 1095 n.68 (Del. 2001) (noting that Section 102(b)(7) does not eliminate the underlying fiduciary duty). The charter may also contain provisions renouncing certain corporate opportunities, *see* 8 *Del. C.* § 122(17), or placing limitations on the extent to which the business and affairs of the corporation shall be managed by or under the board of directors, *see* 8 *Del. C.* § 141(a). In these settings,

17

General Partner exercised the Call Right in breach of the requirements set forth in Section 15.1(b) of the Partnership Agreement. Both theories state claims on which relief can be granted.

### 1. Principles Of Contract Interpretation

The Partnership Agreement is a contract governed by Delaware law. *See* 6 *Del. C.* § 17-1101(c). When interpreting such a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "Contract language is not ambiguous merely because the parties dispute what

---

the fiduciary duty is technically not contractual, but it arises out of a voluntary, contract-like relationship and can be modified by contract. A fiduciary duty in that setting might be described as a contractually regulated or modified fiduciary duty.

When a contract creates the fiduciary relationship, or when the status that carries with it fiduciary duties has a contractual or contract-like dimension, then it may be helpful to use terms like contractual fiduciary duties or contractually regulated fiduciary duties. In the current setting, where the Partnership Agreement eliminates fiduciary duties entirely, it seems unhelpful, even potentially misleading, to refer to contractual fiduciary duties, thereby partially restoring an equitable framework that the parties who created the relationship sought to avoid. This decision therefore speaks only in terms of breach of contract.

it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Id.* (footnote omitted). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

If the language of a contract is ambiguous, the court "cannot choose between two differing reasonable interpretations" when deciding a Rule 12(b)(6) motion to dismiss. *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996). "Dismissal is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law." *Id.* (emphasis in original).

### 2. Breach Of Section 7.9

The plaintiffs contend that the General Partner failed on two occasions to adhere to the standards of conduct set forth in Section 7.9: initially when it made the Potential-Exercise Disclosure and subsequently when it engaged in the Call-Right Exercise. The complaint states a claim for breach of contract in connection with the Potential-Exercise Disclosure. The complaint does not state a claim in connection with the Call-Right Exercise.[2]

---

[2] Although the complaint does not separately describe the Potential-Exercise Disclosure as a breach of Section 7.9(a), the complaint fairly presents the contention that Section 7.9(a) governs the decision to make that disclosure. The complaint describes the

### a. The Contractual Standards In Section 7.9

Section 7.9 of the Partnership Agreement divides the actions that the General Partner might take into three broad categories and establishes a standard of conduct for each. One standard addresses actions taken by the General Partner in its individual capacity, another addresses actions taken by the General Partner in its official capacity as the general partner that do not involve any potential conflicts of interest, and a third addresses actions taken by the General Partner in its official capacity as the general partner that involve a potential conflict of interest.

When the General Partner takes an action in its individual capacity, the standard set out in Section 7.9(c) applies:

> Whenever the General Partner makes a determination or takes or declines to take any other action . . . in its individual capacity as opposed to in its capacity as the general partner of the Partnership, . . . then the General Partner . . . [is] entitled to make such determination or to take or decline to take such other action free of any fiduciary duty or obligation whatsoever to the Partnership, any Limited Partner or Assignee, and the General Partner . . . shall not be required to act in good faith or pursuant to any other standard imposed by this Agreement . . . [or] any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity.

---

two actions it challenges—the Potential-Exercise Disclosure and the Call-Right Exercise—as part of a single "conflicted and disloyal scheme . . . to artificially depress the price of Boardwalk units and then purport to exercise the Call Right based on a sham Opinion of Counsel . . . ." Compl. ¶ 188(c). The plaintiffs contend that the defendants achieved the artificial depression of Boardwalk's unit price by making the Potential-Exercise Disclosure. *See* Compl. ¶ 229. The complaint thus advances the contention that both the Potential-Exercise Disclosure and Call-Right Exercise implicated a potential conflict of interest.

Agr. § 7.9(c). Under this provision, when acting in its individual capacity, the General Partner does not owe any duty to the Partnership or its limited partners, can act in its own interest, and does not have to believe in good faith that its actions are in the best interest of the Partnership. *See Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 173–75 (Del. Ch. 2014) (interpreting identical provision), *aff'd*, — A.3d —, 2015 WL 803053 (Del. Ch. Feb. 26, 2015) (TABLE). The General Partner's ability to act in its individual capacity, free of competing obligations or commitments, parallels the ability of a corporate fiduciary to exercise rights that are not held or exercised in a fiduciary capacity, such as a controlling stockholder's ability to exercise its rights as a lender or to vote its shares in its own interest. *See generally* 1 Stephen A. Radin, *The Business Judgment Rule* 1171 (6th ed. 2009).

When taking an action in its official capacity as the general partner, the General Partner faces two different standards of conduct, each of which requires giving consideration to interests other than its own. If the matter that the General Partner is addressing in its official capacity does not involve a potential conflict of interest, then the standard of conduct set out in Section 7.9(b) applies:

> Whenever the General Partner makes a determination or takes or declines to take any other action, or any of its Affiliates causes it to do so, in its capacity as the general partner of the Partnership as opposed to its individual capacity, . . . then, unless another express standard is provided for in this Agreement, the General Partner, or such Affiliates causing it to do so, shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards imposed by this Agreement . . . [or] any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity.
>
> In order for a determination or other action to be in "good faith" for purposes of this Agreement, the Person or Persons making such determination or

21

taking or declining to take such other action must believe that the determination or other action is in the best interests of the Partnership.

Agr. § 7.9(b) (formatting altered). Under this standard, the General Partner must act in good faith, meaning that the General Partner must subjectively believe that its decision is in the best interests of the Partnership. *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013) (interpreting "believes" as opposed to "reasonably believes" to refer to subjective belief rather than objective belief).

If the action that the General Partner is taking in its official capacity involves a potential conflict of interest, then the standard of conduct set out in Section 7.9(a) applies:

> Unless otherwise expressly provided in this Agreement . . . , whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, . . . any Partner or any Assignee, on the other, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

Agr. § 7.9(a). Under this provision, the General Partner must be able to show that it complied with one of four enumerated paths for its action "not [to] constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity." *See id.*

The Delaware Supreme Court affirmed this interpretation of a nearly identical set of provisions. *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 2015 WL 803053, at *1 (Del.

22

Feb. 26, 2015) (TABLE). The plaintiffs, however, argue for a different interpretation. They claim that nothing in the language of Section 7.9(a) limits its application to actions taken by the General Partner in its official capacity, and they assert that Section 7.9(a) therefore also applies whenever the General Partner acts in its individual capacity and faces a potential conflict.

In addition to running contrary to precedent, the plaintiffs' proposed reading disregards the broad authority granted to the General Partner in Section 7.9(c) when acting in its individual capacity. That section does not impose limitations of any kind. The plaintiffs' proposed reading also ignores the structure of Section 7.9 as a whole, in which the standards of conduct progress from the most closely regulated category of action (the General Partner acting in its official capacity on a matter involving a potential conflict of interest under Section 7.9(a)), through a less regulated category of action (the General Partner acting in its official capacity on a matter not involving a potential conflict of interest under Section 7.9(b)), to the least regulated category of action (the General Partner acting on an issue in its individual capacity under Section 7.9(c)). It would be inconsistent with the structure of this progression to double back and impose the heightened standard set out in Section 7.9(a) on a subset of the category of actions covered by Section 7.9(c).

The structure of Section 7.9 also must be interpreted against the backdrop of the common law. As the *El Paso* decision explained, the progression of standards in Section 7.9

> resembles the analytical progression of fiduciary duty law, where the highly deferential business judgment rule applies to non-conflict transactions, the entire fairness test applies to conflict transactions, and specific standards like

23

the corporate opportunity doctrine apply under particular circumstances. The absence of any contractual duty on the General Partner when not acting in that capacity similarly resembles the ability of a controlling stockholder (otherwise a fiduciary) to vote its shares in its own interest or for reasons of whim or caprice. In this way, the [Partnership] Agreement borrows its basic framework from the common law, but replaces the common law rules with contractual standards more favorable to the General Partner.

*El Paso*, 90 A.3d at 1103. Under the plaintiffs' reading, the Partnership Agreement would borrow its basic framework from the common law, then introduce a far more onerous contractual standard that would apply when the General Partner faced a potential conflict of interest while acting in its individual capacity.

Finally, to read such a standard into the Partnership Agreement would run contrary to the approach invariably taken by the drafters of agreements that govern publicly traded alternative entities. That approach employs the contractual freedom offered by the alternative entity statutes to establish regimes that are less constraining of controllers and less protective of investors than the common law.[3] It is not reasonable to read the Partnership Agreement as the lone exception to that overwhelming trend.

---

[3] *See generally* Sandra K. Miller & Yvonne L. Antonucci, *Default Rules and Fiduciary Duty Waivers in Alternative Entities: Policy Issues and Empirical Insights*, 42 J. Corp. L. 147 (2016); Sandra K. Miller & Karie Davis-Nozemack, *Toward Consistent Fiduciary Duties for Publicly Traded Entities*, 68 Fla. L. Rev. 263 (2016); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities*, 39 J. Corp. L. 295 (2014); Brent J. Horton, *The Going-Private Freeze-Out: A Unique Danger for Investors in Delaware Non-Corporate Business Associations*, 38 Del. J. Corp. L. 53 (2013); Mohsen Manesh, *Contractual Freedom Under Delaware Alternative Entity Law: Evidence from Publicly Traded LPs and LLCs*, 37 J. Corp. L. 555 (2012).

### b.     The Call-Right Exercise

The plaintiffs claim that the General Partner breached its obligations under Section 7.9 by engaging in the Call-Right Exercise. The threshold question is which subsection of Section 7.9 applies. The plaintiffs contend that Section 7.9(a) applies because the express terms of that section do not limit its applicability to actions taken by the General Partner in its official capacity. For the reasons explained in the prior section, that reading conflicts with the plain meaning of the Partnership Agreement.

Instead, Section 7.9(c) governs. That section applies "[w]henever the General Partner . . . [acts] in its individual capacity," and according to Section 7.9(c), the General Partner acts in its individual capacity "whenever the phrase, 'at the option of the General Partner,' or some variation of that phrase, is used in [the Partnership] Agreement." Agr. § 7.9(c). Under Section 15.1(b), the Call Right was "exercisable at [the General Partner's] option" upon satisfaction of the two preconditions. *Id.* § 15.1(b). The General Partner therefore exercised the Call Right in its individual capacity subject to the Section 7.9(c) standard of conduct.

Because the General Partner exercised the Call Right subject to the standard of conduct in Section 7.9(c), the General Partner was entitled to do so "free of any fiduciary duty or obligation whatsoever" and was not "required to act in good faith or pursuant to any other standard imposed by [the Partnership] Agreement . . . ." *See id.* § 7.9(c). Section 7.9(c) relieved the General Partner of any duties or obligations with respect to the Call-Right Exercise, so the General Partner could not have breached that section by exercising

25

the Call Right. To the extent that Count II asserts a breach of Section 7.9 based on the Call-Right Exercise, that claim is dismissed.

### c. The Potential-Exercise Disclosure

The plaintiffs also contend that the General Partner breached its obligations under Section 7.9 by issuing the Potential-Exercise Disclosure. The analysis of that issue is more complex because the parties agree that the General Partner was acting in its official capacity as the general partner when it made the Potential-Exercise Disclosure. *See* Dkt. 99 at 47; Dkt. 106 at 38 n.16. The next question is whether the General Partner faced a potential conflict of interest when making that decision. If it did, then Section 7.9(a) applies. If not, then Section 7.9(b) applies.

Section 7.9(a) applies when "a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, . . . any Partner or any Assignee, on the other . . . ." Agr. § 7.9(a). The Agreement defines "Partners" to refer to the limited partners. *Id.* § 1.1 at 18. Section 7.9(a) then specifies four ways by which "the resolution or course of action in respect of such conflict of interest" may be approved. *Id.* § 7.9(a).

The complaint alleges facts supporting a reasonable inference that the course of action that the General Partner followed when issuing the Potential-Exercise Disclosure involved a potential conflict of interest. The disclosure was highly likely to have a negative impact on the trading price of the common units. Because the purchase price under the Call Right was based on the units' average trading price over a 180-day measuring period, a decline in the trading price would enable the General Partner to pay less if the General

26

Partner later chose to exercise the Call Right. All else equal, an earlier disclosure and a longer delay between the disclosure and the exercise of the Call Right would benefit the General Partner and harm the limited partners by reducing the number of unaffected days in the measuring period.

The defendants have argued that the Partnership "was obligated under Item 1A of Form 10-Q to disclose in its April 2018 Form 10-Q . . . the fact that the General Partner was seriously considering exercising the Call Right." Dkt. 99 at 42 n.13. Item 1A requires the disclosure of "any material changes from risk factors as previously disclosed in the registrant's Form 10-K." *Id.* (quoting SEC Form 10-Q, Item 1A). In each annual filing since the time of its IPO in 2005, the Partnership's Form 10-K has disclosed as risk factors the Call Right and the limitations on the General Partner's duties in connection with the Call Right. *Id.* (citing Ex. 3 at 19–20). According to the defendants, the Revised Policy Statement and the fact that the General Partner was seriously considering exercising the Call Right constituted material changes in those risk factors. *Id.* (citing Ex. 11 at 33–35).

This is one possible inference, but it is not the only possible inference. The point at which the consideration of a potential acquisition becomes sufficiently definite to be material is a judgment-laden issue that turns on the facts and circumstances. *See Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988); *Shamrock Hldgs., Inc. v. Polaroid Corp.*, 559 A.2d 257, 275 (Del. Ch. 1989); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38–40 (2011). Determining the issue of materiality "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences . . . . Only if the established omissions are so obviously

27

important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law . . . ." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (footnote and internal quotation marks omitted). It is not possible to determine at the pleading stage whether the General Partner was obligated under the federal securities laws to cause the Partnership to make the Potential-Exercise Disclosure when it did. It is reasonably conceivable that the Potential-Exercise Disclosure was made early and strategically with the goal of driving down the price of the common units and enabling the General Partner to exercise the Call Right at a lower price.

It is therefore reasonably conceivable that when the General Partner faced the decision about whether and when to make the Potential-Exercise Disclosure, the General Partner faced a potential conflict implicating Section 7.9(a). Under that section, the "resolution" of the potential conflict and the "course of action" that the General Partner chose to follow is "permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement," if the General Partner proceeded along one of four contractually specified paths. Agr. § 7.9(a). In general terms, the four paths are (i) good faith approval by a committee composed of disinterested members of the General Partner's board, (ii) approval by disinterested unitholders, (iii) a resolution on arm's-length terms comparable to what a third party would provide, or (iv) a resolution that is fair and reasonable to the Partnership.

There is no suggestion that the General Partner proceeded along either the first or second paths. It is reasonably conceivable that the third path was not available to the

28

General Partner because it turns on whether the Partnership received arm's-length terms in a transaction. That leaves the fourth path. At the pleading stage, it is reasonably conceivable that it was not "fair and reasonable" to the Partnership for the General Partner to cause the Partnership to make the Potential-Exercise Disclosure.

Importantly, the "fair and reasonable" standard focuses on *the Partnership*. As the Delaware Supreme Court has recognized, a standard of this type does not require a determination that the decision in question is in the best interests of the limited partners, but only whether it "was in the best interests of the Partnership (which included the general partner and the limited partners)." *Norton v. K-Sea Transp. P'rs, L.P.*, 67 A.3d 354, 367 (Del. 2013). This court has reached the same conclusion on multiple occasions.[4]

The decision to use "best interests of the Partnership" reflects a contractual departure from the fiduciary standard of conduct that would apply in the corporate arena,

---

[4] *See In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2015 WL 4975270, at *7 (Del. Ch. Aug. 20, 2015) ("Importantly, the operative tests focus on the Partnership, *viz.*, whether the MLP Merger was (i) in the best interests of the Partnership and (ii) fair and reasonable to the Partnership."), *aff'd*, 135 A.3d 76 (Del. 2016); *El Paso*, 113 A.3d at 180 ("The second aspect of the contractual test that deserves additional discussion is the referent for the Conflicts Committee's good faith belief, namely that the conflict-of-interest transaction is in the best interests of the Partnership. The contractual standard does not require the Conflicts Committee to make a determination regarding the best interests of the limited partners as a class."); *Gelfman v. Weeden Invs., L.P.*, 792 A.2d 977, 986 (Del. Ch. 2001) (concluding that a standard that obligated the General Partner to consider the best interest of the Partnership meant that the General Partner "need not—*as a contractual matter*—consider the interests of the limited partners") (emphasis in original); *Sonet v. Timber Co.*, 722 A.2d 319, 325 (Del. Ch. 1998) ("In any event, pursuant to § 6(b) of the agreement, in situations where the General Partner is authorized to act according to its own discretion, there is no requirement that the General Partner consider the interests of the limited partners in resolution of a conflict of interest.").

29

and that would have applied by default under an alternative entity agreement that did not modify or eliminate fiduciary duties. In the settled Delaware formulation, fiduciary duties run not only to the corporation, but rather "to the corporation and its shareholders."[5] A board of directors thus owes fiduciary duties to the corporation for the ultimate benefit of its residual risk bearers, *viz.*, the class of claimants represented by the undifferentiated equity.[6] When exercising their authority, directors must seek "to promote the value of the corporation for the benefit of its stockholders."[7] "It is, of course, accepted that a corporation may take steps, such as giving charitable contributions or paying higher wages, that do not maximize corporate profits currently. They may do so, however, because such activities

---

[5] *In re Rural Metro Corp.*, 88 A.3d 54, 80 (Del. Ch. 2014) (quoting *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007)), *aff'd sub nom.*, *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[D]irectors owe fiduciary duties . . . to the corporation and its shareholders . . . ."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties . . . to the corporation and its shareholders.").

[6] *See Frederick Hsu Living Trust v. ODN Hldg. Corp.*, 2017 WL 1437308, at *17 (Del. Ch. Apr. 14, 2017); *In re Trados Inc. S'holder Litg.*, 73 A.3d 17, 36–37 (Del. Ch. 2013).

[7] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord Gheewalla*, 930 A.2d at 101 ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[] owners.") (internal quotation marks omitted); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *see also* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

are rationalized as producing greater profits over the long-term." Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For-Profit Corporations Seek Profit*, 47 Wake Forest L. Rev. 135, 147 n.34 (2012). Decisions of this nature benefit the corporation as a whole and, by increasing the value of the corporation, increase the share of value available for the residual claimants. Nevertheless, "Delaware case law is clear that the board of directors of a for-profit corporation . . . must, within the limits of its legal discretion, treat stockholder welfare as the only end, considering other interests only to the extent that doing so is rationally related to stockholder welfare."[8]

Because of the obligation to maximize the value of the corporation for the benefit of the undifferentiated equity, directors must consider how their decisions affect the common stockholders. When making decisions that have divergent implications for different aspects of the capital structure, a board's fiduciary duties call for the directors to prefer the interests of the common stock, so long as that can be done in compliance with the corporation's commitments to contractual claimants.[9]

---

[8] Leo E. Strine, Jr., *A Job is Not a Hobby: The Judicial Revival of Corporate Paternalism and its Problematic Implications*, 41 J. Corp. L. 71, 107 (2015); *accord* Leo E. Strine, Jr. *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporation Law*, 50 Wake Forest L. Rev 761, 771 (2015) ("Non-stockholder constituencies and interests can be considered, but only instrumentally, in other words, when giving consideration to them can be justified as benefiting the stockholders."); Strine, *For-Profit Corporations*, *supra*, at 147 n.34 ("[S]tockholders' best interest must always, within legal limits, be the end. Other constituencies may be considered only instrumentally to advance that end.").

[9] *See Gheewalla*, 930 A.2d at 101 ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must

The Partnership Agreement eliminates any analogous duty to prefer the interests of the limited partners. Section 7.9(a)(iv) instead requires that the General Partner follow a course of action that is fair and reasonable to the Partnership as an entity. When considering that issue, the General Partner has discretion to consider the full range of entity constituencies in addition to the limited partners, including but not limited to employees, creditors, suppliers, customers, and the General Partner itself. Nevertheless, because the limited partners are one of the Partnership's constituencies, "[a] transaction that is in the

---

continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners."); *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 452 (Del. Ch. 2010) ("[I]t is the duty of directors to pursue the best interests of the corporation and its common stockholders, if that can be done faithfully with the contractual promises owed to the preferred . . . ."); *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 790 (Del. Ch. 2004) ( "Having complied with all legal obligations owed to the firm's creditors, the board would . . . ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value."); *Blackmore P'rs, L.P. v. Link Energy LLC*, 864 A.2d 80, 86 (Del. Ch. 2004) ("[T]he allegation that the Defendant Directors approved a sale of substantially all of [the company's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative . . . . [I]t would appear that no transaction could have been worse for the unit holders and [it is] reasonable to infer . . . that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors."); *Equity-Linked Inv'rs, L.P. v. Adams*, 705 A.2d 1040, 1042 (Del. Ch. 1997) ("[G]enerally it will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences, etc., of preferred stock, where there is a conflict.").

32

best interests of the Partnership logically should not be highly unfair to the limited partners." *Dieckman v. Regency GP LP*, 2018 WL 1006558, at *4 (Del. Ch. Feb. 20, 2018) (ORDER) (internal quotation marks omitted).

On the facts pled, it is reasonably conceivable that that the Potential-Exercise Disclosure was so highly unfair to the limited partners as to make it not fair and reasonable to the Partnership. The complaint alleges that by causing the Partnership to issue the Potential-Exercise Disclosure, the General Partner "eviscerated the contractual . . . protections afforded to minority unitholders by publicly threatening to consummate a buyout, without actually committing to do so." Compl. ¶ 11. The pertinent allegations of the complaint state:

> The purpose of Defendants' disclosures was clear: by threatening to exercise the option in the near term and at some uncertain price, the General Partner . . . sent Boardwalk's market price into immediate freefall. This sharp drop in Boardwalk's market price uniquely benefitted Defendants at the expense of Boardwalk's minority unitholders.

> Each day that Boardwalk's units traded lower, the average 180-trading day price moved lower and made the option cheaper to exercise. Relatively higher closing prices at the beginning of the 180-trading day average were pushed out and replaced with dramatically (and artificially) depressed closing prices at the end of the period.

*Id.* ¶ 12 (formatting altered).

Under a constituency-based regime like the one established by the Partnership Agreement, it is possible that benefits to the entity as whole or to its other constituencies might outweigh harm to a particular constituency, such as the limited partners. Causing a company to comply with its disclosure obligations under the federal securities laws is obviously a benefit to the entity. For the reasons previously discussed, however, it is not

33

clear at the pleading stage whether the General Partner was obligated to cause the Partnership to make the Potential-Exercise Disclosure, or whether the disclosure was made opportunistically. If the defendants are able to prove that that the disclosure was legally required, then that would go a long way to establishing that the General Partner acted in a manner that was fair and reasonable to the Partnership.

Setting aside the benefit to the Partnership of complying with the federal securities laws, it is unclear at the current stage of the case whether the Potential-Exercise Disclosure had any effect on the entity as a whole or any constituencies other than the General Partner and the limited partners. The only evident effect of that disclosure was to drive down the price of the common units so that the contractual pricing mechanism would cause a transfer of value from the holders of common units to the General Partner. It is not intuitively apparent how the Potential-Exercise Disclosure would have had offsetting positive effects on the Partnership's business, employees, customers, suppliers, or the communities in which it operates.

The factual scenario as-pled thus has two dimensions: (i) intentional harm to one constituency without any apparent benefit to other constituencies or to the business of the entity as a whole, and (ii) a causal mechanism by which the harm inflicted on one constituency benefits the party in control of the decision. Taken together, these dimensions support a reasonable inference that it was not "fair and reasonable to the Partnership" for the General Partner to cause the Partnership to issue the Potential-Exercise Disclosure on April 30, 2018. A party in control of an enterprise should not be able to transfer value from a particular constituency to itself, even under a constituency-based regime. Rather than a

34

reasoned exercise of judgment about what is in the best interests of the entity, that type of value expropriation more closely resembles theft.[10]

The complaint's allegations support a pleading-stage inference that the Potential-Exercise Disclosure was "highly unfair" to the limited partners and thus not "fair and reasonable" to the Partnership. Accordingly, with respect to the disclosure, the complaint states a claim against the General Partner for breach of Section 7.9(a).

### 3. Breach Of Section 15.1

Shifting away from the contractual standards in Section 7.9, the plaintiffs separately contend that the General Partner failed to comply with the contractual requirements of the Call Right itself. The complaint identifies five alleged faults in the Call-Right Exercise. Two of them support a reasonably conceivable claim for breach of contract. The others do not.

---

[10] The case would be stronger for the defendants if the Partnership had the right to buy the common units because in that case, the entity as a whole would benefit from the lower price. Even then, the analysis would likely turn on whether the General Partner was obligated to make the disclosure under the federal securities laws, or whether it acted opportunistically to drive down the price of the common units.

The case would be much stronger for the defendants if it were clear at the pleading stage that the contractual standard only required the defendants to believe subjectively in good faith that the course of action benefitted the Partnership, as would be the case under Section 7.9(b). In that event, it is possible that the claim would not survive a motion to dismiss. *See Kinder Morgan*, 2015 WL 4975270, at *8 (dismissing claim for breach of a limited partnership agreement where the defendants had only to believe subjectively that a course of action was in the best interests of the partnership and "[t]he Complaint's allegations do not provide a basis to question the Committee's decision from the standpoint of the Partnership").

To exercise the Call Right, Section 15.1(b) of the Partnership Agreement required that the General Partner first obtain an "Opinion of Counsel" to the effect that the Partnership's status as a pass-through entity for tax purposes "has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers . . . ." Agr. § 15.1(b)(ii). If this condition was not met, then the General Partner was not entitled to exercise the Call Right, and its improper exercise breached Section 15.1(b).

The General Partner obtained the Tax Opinion, but the plaintiffs contend that its contents failed to satisfy the condition. The plaintiffs say that the Tax Opinion was inadequate because it failed to address (i) the Partnership's competitive position vis-à-vis non-MLP pipelines, (ii) the effect of the Revised Policy Statement on the maximum applicable rates that the Partnership could charge, and (iii) the potential implications of a FERC ruling on the treatment of ADIT balances. The plaintiffs also contend that the Tax Opinion fell short because it was based on two purportedly false assumptions: (i) an assumption that the Revised Policy Statement would not change, and (ii) an assumption that the Partnership was charging the maximum recourse rate set by FERC to all of its customers.

### a.     The Partnership's Competitive Position

According to the plaintiffs, Section 15.1(b) required that the Tax Opinion address whether the FERC policy change would put the Partnership at a "competitive disadvantage vis-à-vis other, non-MLP pipelines." Compl. ¶ 204. To support that contention, the plaintiffs point to Section 15.1(b)'s reference to the partnership's "status as an association

36

not taxable as a corporation." *Id.* ¶ 34. As the plaintiffs interpret it, that provision was "intended to allow the General Partner to collapse the MLP structure [only] if Boardwalk's status as a pass-through entity did or was reasonably likely to put the [Partnership] at a material competitive disadvantage vis-à-vis other, non-MLP pipelines." *Id.* ¶ 204.

The language of Section 15.1(b) is clear on its face: The General Partner had to receive an opinion of counsel to the effect that

> the Partnership's status as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers by subsidiaries of the Partnership that are regulated interstate natural gas pipelines . . . .

Agr. § 15.1(b). The analysis only needed to address whether the Partnership's tax-exempt status had or was reasonably likely to have a material adverse effect on the maximum applicable rates that the Partnership could charge its customers. Section 15.1(b) did not require a comparative assessment of the potential effects on the Partnership relative to its non-MLP competitors. Phrases such as "competitive disadvantage" and "vis-à-vis other, non-MLP pipelines" do not appear in Section 15.1(b). The plaintiffs' proposed construction would introduce an analytical requirement that does not appear in the text. The motion to dismiss this aspect of Count II is granted.

### b. "Maximum Applicable Rates"

The plaintiffs next contend that the Tax Opinion failed to address the probable effect of the FERC policy change on the "maximum applicable rate" that the Partnership could charge its customers. The plaintiffs contend that the term "maximum applicable rate" refers

to the rates that the Partnership could *actually* charge, taking into account its long-term contracts that established customer-specific rates. When preparing the Tax Opinion, Baker Botts interpreted the term "maximum applicable rate" to mean recourse rates, which are the FERC-approved rates that a shipper can opt to pay for services if the shipper has not contracted for negotiated rates and if the Partnership does not offer discounted rates.

The defendants argue that a plain reading of the term "maximum applicable rate" means recourse rates. The Partnership Agreement could have addressed this issue directly by defining the term "maximum applicable rate." It could have addressed this issue indirectly by defining any number of related terms such as "applicable rate," "negotiated rate," "recourse rate," "maximum rate," or "maximum negotiated rate." It did not.

To establish that a plain reading of the term "maximum applicable rate" means recourse rates, the defendants claim that FERC treats those terms as synonymous. Dkt. 99 at 26 (collecting FERC regulatory rulings). The FERC regulatory rulings that the defendants cite do not actually use the term "maximum applicable rate." They use a variety of terms, with the closest being "applicable maximum rate." None of the regulatory rulings define the term "applicable maximum rate," nor do they define any of the related terms that they use.

The FERC's regulatory rulings do not reflect a clear pattern of usage sufficient to establish at the pleading stage that "applicable maximum rate" is a term of art meaning recourse rates. The defendants have pointed to two regulatory rulings in which FERC sometimes juxtaposed the term "applicable maximum rate" with the term "negotiated rate,"

suggesting that they were mutually exclusive.[11] But there are numerous other instances where FERC's use of those terms is less clear, and where the use of the word "applicable" appears to refer a pipeline's actual rates, whether negotiated, discount, or recourse.[12] Using the word "applicable" in the latter sense comports with its dictionary meaning, in which the adjective "applicable" would refer to the rates actually being applied in a given situation, rather than those that theoretically could be applied in the absence of other rates.[13]

---

[11] *See, e.g.*, *NextEra Energy Mktg., LLC*, 165 FERC ¶ 61,175, at 1 (Nov. 28, 2018) ("According to Petitioners, the subject *negotiated rate* is higher than Tennessee's *applicable maximum rate*.") (emphasis added); *EdgeMarc Energy Hldgs., LLC*, 165 FERC ¶ 61,036, at 2 (Oct. 22, 2018) ("[T]he Commission would not waive the *applicable maximum rate* to permit a release at a rate in excess of the *negotiated rate* . . . .") (emphasis added). The defendants also cited a letter ruling that juxtaposed the concept of "discounted rates" with "maximum applicable tariff rates," which introduces additional terms into the analysis. *See Gulf S. Pipeline Co., LP*, Dkt. No. RP04-223-000, at 2 (Apr. 16, 2004) (letter order).

[12] *See* Interstate and Intrastate Natural Gas Pipelines; Rate Changes Relating to Federal Income Tax Rate, 83 Fed. Reg. 12,888, 12,891, 12892 (Mar. 26, 2018) (to be codified at 18 C.F.R. pts. 154, 260, 284) (using "maximum recourse rate" and "maximum rate" rather than "applicable maximum rate"; using "all applicable rates" to encompass the negotiated rate, the maximum recourse rate, or the discounted rate); *EdgeMarc Energy Hldgs., LLC*, 165 FERC ¶ 61,036, at 2 (Oct. 22, 2018) (discussing the possibility that a pipeline's "applicable rates are above or below the applicable maximum recourse rates"); *Chesapeake Energy Mktg., L.L.C.*, 164 FERC ¶ 61,277, at 3 (Sept. 27, 2018) (describing permanent releases in situations where "the *negotiated rates* applicable to the released capacity are above the *applicable maximum recourse rates*") (emphasis added).

[13] *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) ("'Applicable' means 'capable of being applied: having relevance' or 'fit, suitable, or right to be applied: appropriate.'") (citing Webster's Third New International Dictionary 105 (2002); New Oxford American Dictionary 74 (2d ed. 2005); 1 Oxford English Dictionary 575 (2d ed. 1989)); *see also Apply*, Dictionary.com, https://www.dictionary.com/browse/apply (last visited Oct. 5, 2019) ("3: to bring into action; use; employ . . . .").

To prevail on a motion to dismiss, the defendants must establish that their interpretation of the term "maximum applicable rate" is the only reasonable interpretation. *See United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). The defendants have not made the necessary showing. It is reasonably conceivable that the term "maximum applicable rates" means the maximum rates that the pipeline actually could charge, rather than the maximum rates that the pipeline theoretically could charge. The motion to dismiss this aspect of Count II is denied.

### c.        The Treatment Of ADIT Balances

The complaint next contends that the Tax Opinion did not satisfy the requirements of Section 15.1(b) because it failed to account for FERC's future treatment of ADIT balances. The plaintiffs argue that the Tax Opinion should have "address[ed] this critical issue," or that Baker Botts should have "wait[ed] for FERC to clarify its treatment of ADIT balances in light of the policy change . . . ." Dkt. 106 at 27.

Because the Partnership Agreement did not explicitly require the Tax Opinion to account for ADIT balances, the plaintiffs' criticism amounts to an attack on Baker Botts' methodology. When the parties to a contract agree that the delivery of an opinion of counsel satisfies a condition precedent, "it is [counsel]'s subjective good-faith determination that is the condition precedent." *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *11 (Del. Ch. June 24, 2016). Counsel acts in subjective good faith by applying its independent expertise to the facts presented. *Id.*

The question under *Williams* is not whether Baker Botts used a suboptimal methodology, nor even whether Baker Botts made mistakes. The question at the pleading

40

stage is whether the complaint has identified sufficient reasons for concern about Baker Botts' analysis to raise a reasonable inference that the firm did not apply its independent expertise to the facts presented, but rather skewed its analysis in a bad-faith effort to reach the outcome that its client wanted.

In the Revised Policy Statement, FERC accounted that it would "no longer permit an MLP to recover an income tax allowance in its cost of service," but FERC did not address how it would treat ADIT balances moving forward. Ex. 4 at 1. In fact, the Revised Policy Statement did not mention ADIT balances at all. At the pleading stage, however, the plaintiffs are entitled to the reasonable inference that it was obvious to all of the industry players that the treatment of ADIT balances would be a major issue. Indeed, FERC asked for input on the treatment of ADIT balances in its Notice of Inquiry and sought comment on "the effect of the elimination of the income tax allowance for MLPs on ADIT." Inquiry Regarding the Effect of the Tax Cuts and Jobs Act on Commission-Jurisdictional Rates, 83 Fed. Reg. 12,371, 12,375 (Mar. 21, 2018). The notice asked commenters to address "whether previously accumulated sums in ADIT should be eliminated altogether from cost of service or whether those previously accumulated sums should be placed in a regulatory liability account and returned to ratepayers." *Id.*

The possibility of eliminating ADIT balances altogether had the potential to flip the change in the tax treatment of MLP pipelines from a negative to a positive. In the abstract, the Revised Policy Statement seemed like it could be a negative development for MLP pipelines, because they could no longer claim taxes as a cost of service for purposes of setting their rates. But if MLP pipelines also could eliminate their ADIT balances, then

41

they could include their entire asset base for purposes of seeking a reasonable rate of return. And if MLP pipelines did not have to return any of the ADIT balances to their customers, then the Revised Policy Statement would likely be a positive development for MLP pipelines. The Partnership addressed the treatment of ADIT balances when it submitted comments in response to the Notice of Inquiry. Ex. 33.

By failing to address the potential treatment of ADIT balances, Baker Botts ignored the elephant in the room. Once Baker Botts chose not to address the ADIT balances, and after the firm likewise opted to focus its analysis on recourse rates, its opinion became simplistic. At the pleading stage, the plaintiffs are entitled to the reasonable inference that Baker Botts chose to not to analyze the ADIT balances so that it could reach the conclusion that its client wanted, rather than addressing the real-world situation that FERC's regulatory actions presented. The evidence may show that Baker Botts in fact had a good faith basis for proceeding as it did, but at the pleading stage, the decision to ignore the treatment of ADIT balances is sufficiently extreme to warrant permitting discovery into the claim. The motion to dismiss this aspect of Count II is denied.

### d. The Assumption That The Revised Policy Statement Would Not Be Changed

In a related argument, the plaintiffs contend that the Tax Opinion did not satisfy the condition precedent for the exercise of the Call Right because Baker Botts "relied on assumptions that Defendants knew to be false." Compl. ¶ 207. The plaintiffs contend that Baker Botts assumed that the Revised Policy Statement would not be changed, even though the defendants purportedly "knew on June 29, 2018 that FERC's March 15 Proposed [sic]

Policy Statement would soon be 'revised, reversed, [or] modified' . . . ." *Id.* (alteration in original).

This assumption was not false. FERC did not revise, reverse, or modify the Revised Policy Statement. FERC issued an order on July 18, 2018, in which it declined to reconsider the Revised Policy Statement and reaffirmed that FERC "will generally not permit MLP pipelines . . . to recover an income tax allowance in their cost of service." Ex. 5 at 2–3. The Final Rule addressed other aspects of FERC's new rate-setting policies, including the treatment of ADIT balances, but it did not revise, reverse, or modify the Revised Policy Statement.

The plaintiffs' allegations do not support a reasonable inference that Baker Botts failed to exercise its independent judgment when it assumed that the Revised Policy Statement would not be revised, reversed, or modified. The motion to dismiss this aspect of Count II is granted.

### e.  The Assumption About Recourse Rates

The plaintiffs last argue that Baker Botts failed to exercise its independent judgment when it assumed "that each Boardwalk subsidiary would charge all its customers the maximum recourse rate and recover its entire cost of service." Dkt. 106 at 22–23; *see also* Compl. ¶ 158. To support this argument, the plaintiffs point to the Partnership's public announcement that its subsidiaries were *not* charging the maximum recourse rate to the majority of their clients. Dkt. 106 at 22–23 (citing Ex. 33 at 9).

 In rendering its opinion, Baker Botts interpreted the phrase "maximum applicable rate" to mean "the recourse rates of [the Partnership's] Subsidiaries now and in the future

43

. . . ." Ex. 49 at 4. Based on that assumption, Baker Botts analyzed the impact of the Revised Policy Statement on the Partnership's maximum *recourse* rates, rather than the rates the Partnership was *actually charging* its customers.

As this opinion has already discussed, the term "maximum applicable rate" supports at least two reasonable interpretations. That term is not defined in the Partnership Agreement, and Baker Botts reached its own interpretation after considering "the wording of Section 15.1(b)(ii) of the Partnership Agreement, other provisions of the Partnership Agreement and support in the Registration Statement . . . ." Ex. 49 at 4. The complaint does not plead facts sufficient to suggest that Baker Botts failed to use its independent judgment when it interpreted the term "maximum applicable rate" and based its analysis on an assumption consistent with that interpretation. This aspect of Count II is therefore dismissed. The plaintiffs' challenge to the concept of "maximum applicable rate" must rise or fall based on what the contract language is shown to mean, not based on Baker Botts' judgment about what it could mean.

### 4. The Status Of GPGP And The Partnership As Defendants

Count II asserts claims for breach of contract not only against the General Partner, who was the primary actor and decision maker, but also against GPGP and the Partnership. The motion to dismiss the claim for breach of contract against GPGP is granted. The motion to dismiss the claim for breach of contract against the Partnership is denied.

The claim for breach of contract against GPGP fails because GPGP is not a party to the Partnership Agreement. GPGP is the general partner of the General Partner. Although the General Partner is a party to the Partnership Agreement, GPGP is not. "It is a general

44

principle of contract law that only a party to a contract may be sued for breach of that contract." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) (internal quotation marks omitted). Because GPGP is not a party to the Partnership Agreement, the claim against it for breach of contract is dismissed.

The same problem does not infect a claim against the Partnership. By statute, the Partnership was a party to the Partnership Agreement. *See* 6 *Del. C.* § 17-101(14) ("A limited partnership is bound by its partnership agreement whether or not the limited partnership executes the partnership agreement."). The conceptual difficulty arises instead from the fact that the contractual provisions that the plaintiffs seek to invoke concern obligations of the General Partner, not the Partnership.

At this stage, it is not clear the extent to which the Partnership could be liable for breach of its Partnership Agreement if the underlying breach was committed by the General Partner. In at least one setting, the Delaware Supreme Court has held that when limited partners argued that the general partner had breached a provision analogous to Section 7.9(a), the resulting claim was derivative. *See El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016). If the same analysis applied to the plaintiffs' claim that the General Partner breached Section 7.9(a) when it made the Potential-Exercise Disclosure, then that theory would not support a direct claim for breach of contract against and potential remedy from the Partnership, but rather a derivative claim on behalf of the Partnership. It is reasonably conceivable, however, that because the breach of contract claim in this case involves a disclosure, the claim could be viewed as direct. It is also reasonably conceivable that for remedial purposes, following a transaction in which the limited partners were

45

eliminated from the enterprise, a potential remedy might be awarded against the Partnership. Because of the absence of applicable precedent, the analysis is even less clear for the claim for breach of Section 15.1(b).

At this stage of the case, it would be premature to dismiss the claim for breach of contract against the Partnership when the Partnership was a party to the operative contract (the Partnership Agreement), when the General Partner controlled the Partnership and caused it to take actions that are challenged in the case (such as the issuance of the disclosure), and where a potential remedy may involve the Partnership. The motion to dismiss the breach of contract claim against the Partnership is therefore denied.

## D. Count III: Breach Of The Implied Covenant

Count III of the complaint contends that the General Partner, GPGP, and the Partnership breached their implied contractual obligations under the Partnership Agreement by (i) manipulating the call price of the Call Right, and (ii) relying on the Tax Opinion. Count III states a claim on which relief can be granted.

### 1. Principles Governing The Application Of The Implied Covenant

"The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting." *Dieckman*, 155 A.3d at 367 (footnotes and internal quotation marks omitted). The pleading-stage inquiry for cases involving publicly

46

traded MLPs focuses on whether, "based on a reading of the terms of the partnership agreement and consideration of the relationship it creates between the MLP's investors and managers," the agreement can be reasonably read to imply certain conditions that are necessary to vindicate the reasonable expectations of the parties. *Id.*

The application of the implied covenant is a "cautious enterprise." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010). The implied covenant is "not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." *Id.* at 1128. The implied covenant "does not apply when the contract addresses the conduct at issue." *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896 (Del. 2015). It applies "only when the contract is truly silent concerning the matter at hand." *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotation marks omitted). Because express contractual provisions "always supersede" the implied covenant, an implied covenant claim will not survive a motion to dismiss if it duplicates breach of contract claims. *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Intern., Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *17–18 (Del. Ch. Nov. 19, 2013).

"In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). In describing the implied

47

contractual obligation, the plaintiffs must allege facts suggesting "from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986). That is because "[t]he implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *El Paso*, 113 A.3d at 184. Accordingly, "[t]he implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement." *Dieckman*, 155 A.3d at 361.

### 2. The Call Price

The plaintiffs claim that the General Partner breached its implied contractual obligations by manipulating the call price leading up to the Call-Right Exercise. The plaintiffs have stated a claim on which relief can be granted.

Section 15.1(b) of the Partnership Agreement established a mechanism for setting the call price that turned on the mailing of a notice. Under Section 15.1(c), the General Partner was required to mail notice of its election to exercise the Call Right to minority unitholders at least ten days, but not more than sixty days, before the date it purchased the minority unitholders' units. Agr. § 15.1(c). The Partnership Agreement identified a date three days before the mailing of the notice as the end date for a pricing formula, which set the call price at the average of the daily closing prices of the Partnership's common units over the 180 consecutive trading days immediately before the end date. Agr. § 15.1(b).

48

The defendants contend that the plaintiffs' implied claim fails as a matter of law because "an implied covenant theory cannot be invoked to avoid an express contractual provision." Dkt. 99 at 4. The defendants argue that because "Section 15.1(b) sets forth a clear mechanism for calculating the call price," the plaintiffs "cannot avoid that mechanism by arguing that the same provision contains a conflicting implied term that would require a different price 'unaffected' by Defendants' statements." *Id.* Accordingly, the defendants reason, the plaintiffs' "implied covenant claim is foreclosed by the plain terms of the [Partnership] Agreement." *Id.* at 34.

The defendants' argument focuses too narrowly on whether the express pricing mechanism in Section 15.1(b) displaces the implied covenant. Instead, the analysis involves examining Section 15.1(b) and the reasonable expectations that its terms created. *See Dieckman*, 155 A.3d at 367. Section 15.1(b) set forth a seemingly unobjectionable mechanism for determining the call price. It was "deliberately retrospective," so that the call price would not be affected by the General Partner's decision to exercise. *See* Compl. ¶ 39. Based on this explicit mechanism, it is reasonable to infer at the pleading stage that the parties had a reasonable expectation that the General Partner would notify unitholders about its exercise of the Call Right in a manner that would not affect the call price.

From this "reasonable expectation," the plaintiffs assert an implied term that barred the parties from taking steps to manipulate the price of the common units during the 180-trading-day window. *Id.* ¶ 228. The plaintiffs find it unsurprising that the Partnership Agreement did not include such a term, because they regard a term prohibiting

manipulation of the call price as "so obvious" that the drafters would not have needed to include it in the Partnership Agreement. *See Dieckman*, 155 A.3d at 361.

The plaintiffs have asserted an implied term that is reasonably conceivable. They have also alleged that the General Partner breached the term by manipulating the call price through the Potential-Exercise Disclosure. Most notably, the Potential-Exercise Disclosure represented a marked and unexplained shift from the defendants' initial assessment that the Revised Policy Statement would not have a material effect on the Partnership's revenues. *See* Ex. 9. Just six weeks later, the Partnership announced that the General Partner was "seriously considering" exercising the Call Right. Somehow, the effect of the Revised Policy Statement had shifted from "no material impact on revenues" to an impact amounting to a "material adverse effect." Yet during that six-week period, FERC did not issue any orders or proposed rules, nor did it announce further policy revisions. And other than the Potential-Exercise Disclosure, there is no indication that the Partnership ever revised the "preliminary assessment" that it described in its press release. This sequence of events supports a reasonable inference that the defendants manufactured a basis to make the Potential-Exercise Disclosure because they believed doing so would drive down the call price.

Second, the complaint alleges facts about events connected with this litigation which support a reasonable inference of manipulation. On May 29, 2018, the defendants successfully opposed the plaintiffs' motion to expedite by arguing that the plaintiffs' claims were unripe. After convincing the court to accept that argument, the defendants contacted the original plaintiffs and proposed a settlement. The claims that were not ripe enough to

litigate were somehow ripe enough to settle. After reaching a settlement that contemplated using June 29, 2018, as the end date for calculating the call price, the parties asked the court to review the settlement agreement *in camera*, in effect asking this court to render a non-public advisory opinion before the settlement was announced publicly. This course of conduct contrasts with the defendants' comparative willingness to publicly disclose that they were seriously considering whether to exercise the Call Right.

After this court declined to review the proposed settlement *in camera*, the parties publicly filed the proposed settlement. Four days later, on June 29, 2018, the Partnership announced that it had obtained the Tax Opinion and that the General Partner would exercise the Call Right. The apparent ease with which the Partnership obtained the Tax Opinion and exercised the Call Right after reaching a settlement supports a reasonable inference that the defendants could have exercised the Call Right earlier, but were delaying to enable the Potential-Exercise Disclosure to do its work.

In response, the defendants argue that the parties would not have agreed to restrict the Partnership's ability to make truthful disclosures that were required under the federal securities laws, even if those disclosures might negatively affect the call price. *See* Dkt. 107 at 19. Although it is reasonably conceivable that parties would have understood that a no-manipulation principle inhered in the Partnership Agreement, it is not reasonably conceivable that the parties would have understood that principle to prevent a publicly traded company from making disclosures required by the federal securities laws.

Nevertheless, the Partnership's obligation to comply with the federal securities laws does not result in a pleading-stage dismissal of the implied covenant claim, because it is

51

reasonably conceivable that the defendants could have proceeded in a manner that would have complied with their obligations under both the Call Right and the federal securities laws, without manipulating the price of the Call Right. For example, discovery may establish that the federal securities laws did not require the Partnership to make the Potential-Exercise Disclosure. Or discovery may reveal that the General Partner could have exercised the Call Right promptly in March or April 2018 but instead made the tactical choice to delay. If the defendants were ready, willing, and able to exercise the Call Right in March or April, but nevertheless chose not to do so because they believed that making the Potential-Exercise Disclosure would drive down the price of the common units, then the defendants' conduct could violate the implied covenant.

The allegations of the complaint support a reasonable inference that the defendants delayed the exercise of the Call Right to manipulate the unit price. At the pleading stage, the plaintiffs have stated a claim for breach of the implied covenant.

### 3. The Tax Opinion

The plaintiffs also claim that the General Partner breached its implied contractual obligations by relying on the Tax Opinion. They contend that the General Partner "prevented Boardwalk's minority unitholders from receiving the benefit of [their] bargain by relying in bad faith on a[ Tax] Opinion that ignored [the] central question" of whether the Partnership's "tax status will materially disadvantage the Partnership vis-à-vis other business entity forms" and was "otherwise flawed." Dkt. 106 at 42. This argument duplicates the plaintiffs' claim that the Tax Opinion did not meet the requirements of Section 15.1(b)(ii). It therefore does not state a claim for breach of the implied covenant.

52

### 4. The Status of GPGP and the Partnership as Defendants

As with Count II, Count III asserts a claim for breach of the implied covenant not only against the General Partner, but also against GPGP and the Partnership. The motion to dismiss the claim for breach of contract against GPGP is granted. The motion to dismiss the claim for breach of contract against the Partnership is denied.

As with Count II, Count III is dismissed as to GPGP because it is not a party to the Partnership Agreement, and only a party to a contract may be sued for breach of the implied covenant that inheres in that contract. *Gerber*, 67 A.3d at 421 n.53. As with Count II, it is unclear to what extent the Partnership itself could be liable for breach of an implied obligation in the Partnership Agreement that bound the General Partner, but it is premature to address that issue at this stage.

## E. Count VI: Tortious Interference With Contract

Count VI pleads a claim for tortious interference with contract against the General Partner's controllers: GPGP, Holdings, and Loews. Count IV states a claim on which relief can be granted.

Delaware has adopted the formulation of a claim for tortious interference with contract that appears in the Restatement (Second) of Torts. *WaveDivision Hldgs., LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 751 (Del. 2010). Generally speaking, "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other." RESTATEMENT (SECOND) OF TORTS § 766 (1979),

53

Westlaw (database updated June 2019). Reframed as elements, a plaintiff must plead "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotation marks omitted).

### 1. The Four Straight-Forward Elements

In this case, the complaint easily pleads four of the elements of a claim for tortious interference with contract. The parties agree that there was a contract (the Partnership Agreement) and that GPGP, Holdings, and Loews knew about it. The parties also agree that GPGP, Holdings, and Loews controlled the General Partner, who in turn controlled the Partnership. The complaint sufficiently alleges that GPGP, Holdings, and Loews made an intentional decision to cause the General Partner to make the Potential-Exercise Disclosure, and this decision has held that it is reasonably conceivable that by doing so, the General Partner breached the Partnership Agreement. The plaintiffs also have pled generally that they suffered damages, which is sufficient at the pleading stage. *See, e.g.*, *In re Ezcorp, Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 19 (Del. Ch. 2009). Elements (1), (2), (3) and (5) are therefore met.

### 2. The Element Of Justification

The non-straightforward element is the existence of justification. "The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference

with the promisor's performance." *Shearin v. E.F. Hutton Gp.*, 652 A.2d 578, 589 (Del. Ch. 1994). "The adjective 'improper' is critical. For participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a legitimate part of doing business." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014). "[C]laims for unfair competition and tortious interference must necessarily be balanced against a party's legitimate right to compete." *Agilent Techs. v. Kirkland*, 2009 WL 119865, at *8 (Del. Ch. Jan. 20, 2009). Determining when intentional interference becomes improper requires a "complex normative judgment relating to justification" based on the facts of the case and "an evaluation of many factors." *Shearin*, 652 A.2d at 589 (internal quotation marks omitted).

The Delaware Supreme Court has adopted the factors identified in Section 767 of the Restatement as considerations to weigh when evaluating the existence of justification. *WaveDivision*, 49 A.3d at 1174. The factors are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Id.* Weighing the seven factors identified in the Restatement requires the court to engage in a fact-specific inquiry to determine whether the interference with contract is improper under the particular circumstances of the case. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1979), Westlaw (database updated June 2019) ("[T]his branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a

55

privilege . . . . Since the determination of whether an interference is improper is under the particular circumstances, it is an evaluation of these factors for the precise facts of the case before the court.").

When the defendant that a plaintiff has sued for tortious interference controls an entity that was a party to the contract, the weighing of factors becomes more complex because of the need to balance the important policies served by a claim for tortious interference with contract against the similarly important policies served by the corporate form.

> Ordinarily, of course, only property belonging to the corporation [that is the party to the contract] is available to satisfy obligations of the corporation. Thus, while there may be independent grounds to hold another liable for the obligations of a corporation . . . [,] those in control of a corporation are not typically liable for distinctly corporate obligations by reason of that control. This "fact," of course, supplies one of the principal utilities of the corporate form of organization.

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del. Ch. 1987) (internal citations omitted). A party who wishes to have a parent entity or other controller backstop the obligations of the controlled entity can do so by contract, either by making the parent a party to the agreement or by obtaining a guarantee. A party should not be able to use a claim of tortious interference with contract to reap the benefits of protections that it did not obtain at the bargaining table.

At the same time, Delaware's respect for corporate separateness means that Delaware maintains a role for tortious interference even when one entity controls another. For example, Delaware law rejects the theory that "a parent and its wholly owned subsidiaries constitute a single economic unit" such that "a parent cannot be liable for

56

interfering with the performance of a wholly owned subsidiary." *Shearin*, 652 A.2d at 590; *accord Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006). Delaware law instead balances "the significant economic interest of a parent corporation in its subsidiary," including the parent's legitimate interest in consulting with its subsidiary, against the subsidiary's status as a separate entity and the interests of third parties in their contractual relationships with the subsidiary. *Shearin*, 652 A.2d at 590. The result is a limited affiliate privilege that protects a parent corporation that "pursues lawful action in the good faith pursuit of [the subsidiary's] profit making activities." *Id.* Recognizing a limited affiliate privilege is "consistent with the traditional respect accorded to the corporate form by Delaware law . . . in that it does not ignore that a parent and a subsidiary are separate entities. Rather, it recognizes that the close economic relationship of related entities requires enhanced latitude in defining what 'improper' interactions would be." *Id.* at 590 n.13 (internal citation omitted).

Because these principles are grounded in the economic relationship between a parent entity and its subsidiary, or among affiliated entities, they logically apply to a claim asserting that the controllers of a general partner tortiously interfered with the partnership's governing agreement by causing the general partner and the partnership to breach that agreement. *See, e.g.*, *NAMA*, 2014 WL 6436647, at *28. As with a corporate parent and its subsidiary, or wholly owned affiliates with a common parent, a general partner and its controllers "share the commonality of economic interests which underlay the creation of an interference privilege." *See Shearin*, 652 A.2d at 590 n.14 (holding that for purposes of assessing justification, "the relationship among wholly owned affiliates with a common

57

parent is no different . . . than that between a parent and a subsidiary"). Thus, to sufficiently plead that the controllers of a general partner acted without justification when interfering with a contract to which the general partner was a party, the complaint must allege facts that support a reasonable inference that the interference was "motivated by some malicious or other bad faith purpose" rather than "to achieve permissible financial goals." *See Shearin*, 652 A.2d at 591.

Here, because of the fact-intensive nature of this inquiry, it is not possible to determine at the pleading stage whether GPGP, Holdings, and Loews acted with justification when they caused the General Partner (through the Partnership) to make the Potential-Exercise Disclosure and subsequently exercise the Call Right. Based on the facts alleged in the complaint, however, it is reasonably conceivable that GPGP, Holdings, and Loews interfered with the Partnership Agreement maliciously or in bad faith by causing the Partnership to make the Potential-Exercise Disclosure to drive down the price of the common units and by causing the General Partner to exercise the Call Right opportunistically.

### 3. The Stranger Rule

The tortious interference claim against GPGP, Holdings, and Loews implicates the so-called "stranger rule." Under this rule, the complaint must allege facts supporting a reasonable inference that the defendant is "a stranger to both the contract and the business relationship giving rise to and underpinning the contract." *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007). Two decisions since *Tenneco* have

applied this rule to foreclose liability for tortious interference with contract when the breaching party was controlled by the defendant.[14]

The *Tenneco* decision derived the stranger rule from a Georgia case. *See Tenneco*, 2007 WL 92621, at *5 (citing *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 283–84 (Ga. 1998)). Georgia is part of a competing group of jurisdictions that have adopted an absolute (rather than limited) affiliate privilege.[15] As Chancellor Allen explained,

> According to this theory, a parent and its wholly owned subsidiaries constitute a single economic unit. Reasoning from this premise and acknowledging that an entity cannot be liable for interfering with its own performance of a contract, these courts conclude that a parent cannot be liable for interfering with the performance of a wholly owned subsidiary. Under this theory, "interference" by a parent in the performance of contractual

---

[14] *See Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at *12 (Del. Ch. Aug. 29, 2018); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 884 (Del. Ch. 2009). Two other cases have referenced the "stranger rule" without applying it. One cited *Tenneco* in dicta. *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *12 n.56 (Del. Ch. May 7, 2008) (declining to reach the issue of whether plaintiff's tortious interference claims were foreclosed by the "stranger" rule). Another declined to rule on whether *Tenneco* accurately reflected Delaware law. *See Dieckman*, 2018 WL 1006558, at *5 (indicating that the plaintiff's assertion that tortious interference claims are properly assessed against the contracting entity's affiliates "may be correct under Delaware law"). A final Delaware case did not cite the stranger rule, but nevertheless articulated a bright-line principle under which "a parent cannot be liable for interfering with the performance of a wholly owned subsidiary." *Cencom Cable Income P'rs II, Inc. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999). That statement runs contrary to the Delaware authorities discussed in the text.

[15] Alabama and Texas also take this approach. *See BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 212 (Ala. 2001) (holding that a plaintiff must establish "the *absence* of the defendant's involvement in the business relationship" as an element of its tortious-interference claim) (emphasis in original); *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 348 (Tex. App. 2010) (holding that, under Texas law, "a parent company cannot tortiously interfere with the contracts of its wholly owned subsidiary").

obligations of its wholly owned subsidiary, no matter how aggressive, is not actionable.

*Shearin*, 652 A.2d at 590 (internal citation omitted). By contrast, jurisdictions like Delaware recognize a limited affiliate privilege and employ "a balancing test of the kind elaborated in the Restatement (Second) of Torts." *Id.* The latter approach acknowledges "the significant economic interest of a parent corporation in its subsidiary" but does so without foreclosing potential liability on the sole basis of related-party status. *See id.* When applying the stranger rule, the *Tenneco* court did not explore these differences.

The *Tenneco* decision also cited Section 766 of the Restatement. *See Tenneco*, 2007 WL 92621, at \*5 n.25. Section 766 requires that the contract that forms the subject of a tortious interference claim be between "another and a third person," but that requirement reflects the noncontroversial proposition that "a party to a contract cannot be liable both for breach of [a] contract and for inducing that breach." RESTATEMENT (SECOND) OF TORTS § 766 (1979), Westlaw (database updated June 2019); *see Bhole, Inc.*, 67 A.3d at 453 (alteration in original) (internal quotation marks omitted); *Shearin*, 652 A.2d at 590. Another way to describe that requirement is that the defendant must be "a stranger to the contract." *See* 17B *Corpus Juris Secundum* § 836, Westlaw (database updated Sept. 2019) ("Generally, only a party to a contract or one in privity may enforce it. Generally, *a stranger to a contract* may not bring a claim on the contract.") (emphasis added). It does not follow, however, that the defendant must also be a stranger to the "the business relationship giving rise to and underpinning the contract" to qualify as a "third party" for purposes of Section 766.

In *Tenneco*, the defendant being sued for tortious interference had become an actual party to the insurance policies at issue. *See* 2007 WL 92621 at *5. The *Tenneco* decision therefore did not have to consider the broader implications of applying the stranger rule. Subsequent decisions of this court have quoted language from *Tenneco* without examining these issues. *See Mesirov*, 2018 WL 4182204, at *12 (quoting *Tenneco*, 2007 WL 92621, at *5); *Kuroda*, 971 A.2d at 884 (quoting *Tenneco*, 2007 WL 92621, at *5).

The stranger rule runs contrary to the Delaware Supreme Court's adoption of the multi-factor balancing approach under Section 766. *Cf. Kernaghan v. BCI Commc'ns, Inc.*, 802 F. Supp. 2d 590, 597 (E.D. Pa. 2011) (holding that because Pennsylvania had adopted Section 766, Pennsylvania law did not require that "a defendant be a 'stranger' to the agreement" to state a claim for tortious interference). It also runs contrary to the more nuanced approach that Delaware courts have taken when considering whether corporate controllers or other affiliated entities have interfered with a contract.[16] Delaware's approach uses the concept of justification to determine whether interference is improper and accounts for related-party status when assessing justification. As noted, the result of that approach is a limited affiliate privilege that protects a parent entity that "pursues lawful

---

[16] *WaveDivision*, 49 A.3d at 1174–75 (affirming trial court's determination that four of the seven Restatement factors weighed against a finding of improper interference); *Beard Research, Inc.*, 11 A.3d at 750–52 (describing trial court's analysis of justification and the affiliate privilege as interpreting "too narrowly the nature and scope of a claim for tortious interference"); *NAMA*, 2014 WL 6436647, at *28–36 (balancing the Restatement factors to determine whether the affiliate privilege justified a parent entity's interference with a contract to which its subsidiary was a party).

action in the good faith pursuit of [the subsidiary's] profit making activities." *Shearin*, 652 A.2d at 590 n.13. A bright-line application of the stranger rule would cut off potential liability in these situations, effectively converting Delaware's limited affiliate privilege into an absolute affiliate privilege and upending the balance that Delaware law has struck between respecting corporate separateness and preserving a parent entity's ability to protect its economic interest in its subsidiaries.

This decision has applied the concept of justification using the factors identified in the Restatement and adopted by the Delaware Supreme Court. It would be inconsistent with those authorities to layer on the stranger rule as an additional element of the analysis. Because it is reasonably conceivable that GPGP, Holdings, and Loews used their control over the General Partner to cause it to breach the Partnership Agreement, and that they did so without justification, the complaint has stated a claim for tortious interference with contract.

## III. CONCLUSION

The defendants' motion to dismiss is granted as to Counts IV and V of the complaint. The motion is denied as to Counts II, III, and VI of the complaint. The redundant requests for declaratory judgments in Count I are granted and dismissed to the same extent.